**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 11-490** |
| | : | |
| **EDGARDO MARTINEZ** | : | |
| | : | |

---

**Diamond, J.**                                                                                      **October 7, 2013**

<u>**MEMORANDUM**</u>

In 2011, Defendant Edgardo Martinez, a suspect in a 2006 New Jersey homicide, was detained in Philadelphia by police who were executing an "Emergent Order for Investigative Detention" to collect Defendant's DNA. Under New Jersey law, such an "Emergent" Order—once signed by a New Jersey Superior Court Judge—authorizes the police, on less than probable cause, to detain a suspect to obtain evidence of his "physical characteristics." After stopping Defendant pursuant to the Order, officers took a buccal swab, which indicated that Defendant's DNA did not link him to the 2006 homicide. Officers found a loaded firearm in his waistband, however, and a full magazine for the weapon in his car. As a result, Defendant has been charged with possession of a firearm by a convicted felon. 18 U.S.C. §§ 922(g)(1) and 924(e).

The "Emergent" Order—obtained and executed some five years after the 2006 homicide—was supported by the Affidavit of a New Jersey Detective, who sought the review of a Philadelphia Assistant District Attorney and a Common Pleas Court Judge. Remarkably, the Assistant District Attorney and the Judge approved the document even though no such Emergent Order exists under Pennsylvania law, even though the Order includes an explicit finding of less than probable cause to detain Defendant forcibly for up to five hours, and even though the Affidavit—stripped of its misleading, incredible, and confusing observations—plainly does not

make out probable cause.

Defendant moves to suppress the gun and magazine.  Because the Emergent Order is not based on probable cause, and because the good faith exception does not apply, I will grant Defendant's Motion.

**<u>FINDINGS OF FACT</u>**

Having conducted a suppression hearing, I make the following findings pursuant to Federal Rule of Criminal Procedure 12(d).

At the hearing, the Government called New Jersey Detective Stacie Lick, and Philadelphia Police Detective Dennis Watson and Sergeant Thomas Rehiel.  Defendant called no witnesses.  I credit Detective Watson and Sergeant Rehiel, who testified only as to the detention of Defendant and execution of the Order.  I credit Detective Lick only in part.

A.    *<u>2006 New Jersey Homicide</u>*

On January 20, 2006, Washington Township Police found Juan Cuevas, Sr. dead in his home in Sewell, New Jersey, the victim of "blunt force trauma to the head."  (Lick Aff. ¶¶ 5-6, *ECF No. 34*, Ex. B.)  Cuevas's children were in the home during the attack.  (Aff. ¶ 10.)  Through Detective Lick's Affidavit and testimony, the Government offered cursory detail respecting the Cuevas investigation.  At the crime scene, police extracted DNA from a straw and a cigarette butt believed to have been used by the attackers.  (Aff. ¶ 5.)  In 2009, when Ms. Lick was assigned to the Cuevas investigation, she had been a Detective with the Major Crimes Unit of the Gloucester County, New Jersey Prosecutor's Office for approximately 6 years, and had served as an Investigator for 3 years with the state Attorney General.  (Hr'g Tr. 3:2-13, 11:7-14, Feb. 19, 2013, *ECF No. 46*; Aff. ¶ 1.)    She had also received extensive law enforcement

training.  (Aff. ¶ 2.)  The Government presented no other evidence as to the nature, scope, or circumstances of the murder investigation, whether any other officers were assigned to the matter, or how far the investigation progressed.  To date, no one has been prosecuted for the Cuevas killing.  (Hr'g Tr. 14:12-19.)

       B.       *Detective Lick Seeks an Emergent Order*

During her two year investigation, Detective Lick identified Defendant as a suspect in the Cuevas homicide.  (Hr'g Tr. 3:14-24.)  She sought to compare his DNA to that recovered from the crime scene.  (Id.)  Accordingly, sometime in 2011 (she did not indicate when), she prepared an "Emergent Order for Investigative Detention" and a supporting Affidavit, by which she sought to collect Defendant's DNA.  (Hr'g Tr. 4:6-7.)  This is the only such order Detective Lick has prepared in her 13 years in law enforcement.  (Hr'g Tr. 17:7-13.)

New Jersey law provides that a judge may issue, "[p]rior to the filing of a formal criminal charge against a person, an order authorizing the temporary detention of that person and compelling that person to submit to non-testimonial identification procedures for the purpose of obtaining evidence of that person's physical characteristics."  N.J. C.R. 3:5A-1.  The emergent order may issue if a judge finds "a reasonable and well-grounded basis from which to believe that the person sought may have committed the crime," and that "the results of the physical characteristics obtained . . . [will] determine whether or not the individual probably committed the crime."  Id. 3:5A-4.  The judge may issue the order without notice to the person to be detained if the judge "is satisfied that its underlying purpose would be frustrated were notice to be given," and certifies that "the matter is emergent."  Id. 3:5A-6.  The order may authorize officers "to use reasonable force in effectuating the detention of the person."  Id.  Because she had not reviewed applicable law, Detective Lick was not aware that an emergent order is void if

not "served within five days of its signing." Id. 3:5A-7; (Hr'g Tr. 17:22-25, 18:4-5.)

C.    *The Order and Supporting Affidavit*

At the hearing, the Government introduced Detective Lick's Affidavit and the Emergent Order itself. (Hr'g Tr. 5:9-13.) The Affidavit is an extremely confusing agglomeration of facts, many of which are misleading, contradictory, incredible, or unreliable.

Detective Lick included in her Affidavit an extended account of the Gloucester Township home invasion and robbery of the Moreno family—crimes that are utterly unrelated to Defendant or to Detective Lick's investigation of the Cuevas homicide. (Aff. ¶ 9.) Detective Lick thus averred that, "four masked individuals" entered the Moreno home "in an attempt to rob the owner." (Id.) The assailants, members of a gang "known by police to invade the homes of narcotics dealers who reside in the suburbs," encountered "seven children who they bound with duct tape." (Id.) The Moreno children described the armed assailants as "wearing all black clothing, with masks covering the majority of their faces." (Id.) The children also reported that one of the assailants asked the others whether the "Washington Township home was in close proximity to Atlantic City." (Aff. ¶ 7.)

According to Detective Lick, "[t]he Moreno children provided police with descriptions of the suspects and composite sketches were made of same." (Id.) Yet, the Affidavit also notes the "marked[] similar[ity]" between Defendant and a composite sketch provided by the ***Cuevas*** children. (Aff. ¶ 14.) Detective Lick did not explain why she averred that the Cuevas children had provided a sketch of a suspect that was actually provided by the Moreno children. Moreover, during the hearing, Detective Lick again conflated the Moreno and Cuevas crimes, testifying that the Cuevas children provided the composite sketch. (Hr'g Tr. 13:2-9.) Detective Lick did not testify that she actually saw the composite sketch, that she had compared it with

4

Defendant's appearance, or that she even knew what Defendant looked like (other than the extremely general description in the Affidavit). (Aff. ¶ 24.) The Government did not identify the officer who prepared the composite sketch, call that officer as a witness, or introduce the sketch.

Detective Lick also averred that the investigation of the Moreno home invasion "led to the numerous Communications Data Warrants and Search Warrants, all of which are on file with the Superior Court of New Jersey and are incorporated herein by reference." (Aff. ¶ 8.) Yet, Detective Lick mistakenly testified that she obtained these warrants in connection with the Cuevas investigation. (Hr'g Tr. 11:18-12:5.) Once again, none of these warrants had anything to do with the Cuevas investigation.

The similarities between the Moreno home invasion and the Cuevas homicide—the reference to "Gloucester Township" (which is **not** in Gloucester County), the presence of children, the mention of "Washington Township," the discussion of narcotics dealers—make the inclusion of the Moreno information particularly misleading. Moreover, as I have described, Detective Lick (without any correction by the Prosecutor) compounded the confusion during the suppression hearing by again conflating information relating to the Moreno and Cuevas investigations. Only after the suppression hearing did the Government feebly acknowledge that the Moreno information was improperly included in the Lick Affidavit:

> The detective's affidavit contains some information which appears unconnected or unrelated to this investigation, such as paragraph 9 of the affidavit, which describes a separate home invasion. Either because of an omission or for another reason, paragraphs 7 through 9 of the affidavit provide no information relevant to the probable cause determination in this matter.

(Gov't's Proposed Findings of Fact and Conclusions of Law ¶ 12, *ECF No. 50*.) The

Government has not explained why it waited until *after* the hearing to make this acknowledgment, or why it allowed the Detective to include the "unrelated" information in her suppression testimony.  To say the least, Detective Lick's misleading Affidavit combined with her badly mistaken testimony undermines her credibility.

Detective Lick also averred that a confidential informant provided "[m]embers of the FBI" with information respecting Defendant.  (Aff. ¶ 10.)  The Affidavit does not indicate how the information was conveyed, or where, when, or to whom it was conveyed.  (See id.)  The informant described Cuevas as a narcotics dealer, and Defendant as one of his "peddlers."  (Id.)  According to the informant, Defendant purchased cocaine from Cuevas and sold it at Defendant's nightclub until December 2005, when the nightclub closed following a stabbing.  (Id.)  The informant said that Defendant, in need of money, went with two others to rob Cuevas's home because he heard that Cuevas was expecting a large drug shipment there.  (Id.)  The informant knew that Cuevas's children were in the home during the attack, and that Cuevas died from injuries he had sustained.  (Id.)  Detective Lick made no attempt to corroborate any part of the informant's narrative:

> [**Prosecutor**] Q: With regard to the information provided to you, by informants in this investigation, had you done anything or received any other information from that informant in order to cause you to believe that the information being provided by the informant was reliable for purposes of the affidavit?
>
> [**Detective Lick**] A: No.

(Hr'g Tr. 21:13-18; see also Hr'g Tr. 14:1-11; 15:11-16.)

Detective Lick averred that she spoke with Cuevas's sister, who said that Omar Maldonado had told Cuevas's wife that Defendant "may have taken part" in the Cuevas homicide.  (Aff. ¶ 11.)  Maldonado explained the basis of that belief to Detective Lick on March

8, 2010 (over a year before she sought the Emergent Order), when Maldonado said that he and Defendant had been employed by Cuevas as drug couriers. (Aff. ¶ 12.) On the night of Cuevas's death, drug courier Benny Rosario told Maldonado that Rosario and Defendant were "traveling from Atlantic City," thus placing Defendant in New Jersey—albeit some 53 miles away from Cuevas's home—on the night of the murder. (Id.)

Detective Lick averred that shortly after Cuevas's 2006 murder, DEA Agent Randy Sampson (who had been investigating Cuevas) told her that Rosario owed money to Cuevas "for narcotics dealings." (Aff. ¶ 13.) Detective Lick averred that this information corroborated "Maldonado's assertions some four years later concerning Rosario's employment with Juan Cuevas, Sr." (Id.) Detective Lick included no other information in the Affidavit to corroborate Maldonado's account. (Hr'g Tr. 19:11-13.)

Detective Lick also noted that Defendant "has a lengthy record dating back to 1989; including criminal convictions for Criminal Conspiracy, Robbery, Theft, Assault, Weapons Offenses and Receiving Stolen Property." (Aff. ¶ 20.) Finally, Detective Lick averred that Defendant has "multiple previous and non-verified residential and business addresses" (one of which is included twice). (Aff. ¶ 19.) Because Detective Lick did not check this information, she did not know that one address was Defendant's primary residence; the others were properties he owned. (Hr'g Tr. 15:17-16:9.)

Pared down to its credible, relevant, and corroborated facts, the Affidavit indicates that Cuevas was murdered in Sewell; that Defendant may have been a drug courier for Cuevas; that Defendant, who was over 50 miles from the Cuevas residence on the night of the murder, has a serious criminal record that does not include drug dealing; and that Defendant was a Philadelphia resident.

Detective Lick began her Affidavit as follows: "Based on the information set forth below . . . there is probable cause to believe that, in or upon Edgardo Martinez . . . exists evidence of [the Cuevas murder]." (Aff. ¶ 4.)  Yet, Detective Lick contradicted this statement later in her Affidavit. "Based on . . . the facts recited in this application, I have ***reason to believe*** and do believe that on the person of Edgardo Martinez is evidence [related to the Cuevas homicide]." (Aff. ¶ 15 (emphasis added).)  Detective Lick testified before me that the Emergent Order "operates as less than probable cause." (Hr'g Tr. 18:14-17.)  Plainly, her averment that she believed she had made out probable cause is not credible.

D.      <u>The Emergent Order is Reviewed and Approved in Philadelphia</u>

Detective Lick sought judicial approval to "apprehend and hold [Defendant] for a period of time not to exceed five hours to collect and seize the specimens, namely buccal swabs." (Aff. ¶ 21.)  Detective Lick prepared her draft Order and Affidavit using New Jersey forms. (Hr'g Tr. 4:6-5:24.)  Although Detective Lick was "operating under the direction or supervision of a[n] Assistant District Attorney in the State of New Jersey"—Paul Colangelo—he provided her with no legal advice. (Hr'g Tr. 18:6-10.)  "Because [Detective Lick] wasn't aware of how to proceed in the state of Pennsylvania," she provided her draft Order and Affidavit to Philadelphia Assistant District Attorney Lynne O'Brien for review. (Hr'g Tr. 6:16-17.)  The Government did not call Ms. O'Brien as a witness.  According to Detective Lick, Ms. O'Brien revised only the document's format, not its substance. (Hr'g Tr. 6:24-7:4; 19:25-20:6).  She did not explain to Detective Lick that Pennsylvania law does not authorize such an Order.  She did not comment on the glaring defects in the Affidavit, nor did she remark that the Order's explicit finding of something less than probable cause was insufficient and contradicted Detective Lick's averment that the Affidavit made out probable cause.

On June 16, 2011, Ms. O'Brien met Detective Lick at the Philadelphia Criminal Justice Center and the two went to the chambers of the late, Honorable Thomas Dempsey, where Detective Lick swore to the accuracy of the Affidavit. (Hr'g Tr. 7:17-8:1.) Judge Dempsey asked Detective Lick no questions, failed to observe that Pennsylvania law does not authorize such an Order, said nothing about the Affidavit's many inadequacies, and did not ask why, five years after the Cuevas homicide, an "Emergent" Order was necessary. Rather, Judge Dempsey signed the Affidavit (indicating that Detective Lick had sworn to its truth) and the Order. (Hr'g Tr. 19-20; Emergent Order, *ECF. No. 34* Ex. A.)

        E.       <u>*Detective Lick's Improbable Affidavit and Testimony*</u>

I have already noted inconsistencies between Detective Lick's Affidavit and hearing testimony. In fact, much of her testimony is troubling. For instance, she averred that "exigent circumstances" existed because Defendant had "fled to the Bahamas following Cuevas's death." (Aff. ¶ 17, 18.) Remarkably, her testimony suggests that this is simply untrue.

> [**Defense Counsel**]: Q: Now, in your affidavit, you make reference to the fact that Mr. Martinez had fled to the Bahamas, is that correct?
> [**Detective Lick**]: A: Yes.
> [**Defense Counsel**]: Q: Did you have information supporting that, other than just the fact of putting it in your affidavit?
> [**Detective Lick**] A: No.

(Hr'g Tr. 15:11-16.)

As I have described, Detective Lick sought the Emergent Order two years after she was assigned to the Cuevas matter and five years after the murder itself. Yet, she testified (incredibly) that she did not have the "opportunity" to "verify the veracity" of any information provided to her by the FBI's confidential informant before including that information in her Affidavit. (Hr'g Tr. 14:6-8.)

The Detective averred that in 2006 she gathered evidence related to the Cuevas murder, but testified (without explanation) that she was assigned to the Cuevas investigation in 2009. (Aff. ¶¶ 9, 13; Hr'g Tr. 11:10-11.)

Under New Jersey law, the last day the Order was valid was June 21, 2011. <u>See</u> N.J. C.R. 3:5A-7. Detective Lick did not execute the Order until June 22, 2011. (Hr'g Tr. 10:1-2.)

Finally, as I have discussed, the actual Emergent Order Detective Lick prepared explicitly provides that Defendant's detention is based on less than probable cause. Emergent Order ¶ 2. Detective Lick nonetheless averred that she believed the information in her affidavit made out "probable cause to believe that, in or upon [Defendant], exists evidence . . . of the crime of Criminal Homicide . . . ." (Aff. ¶ 4.)

F.    <u>Officers Execute Order</u>

Detective Lick provided copies of the Order and Affidavit to Sergeant Barry Johnson of the Gloucester County Prosecutor's Office's Fugitive Unit. (Hr'g Tr. 9:8-18.) A member of the U.S. Marshals' Task Force, Sergeant Johnson asked Task Force officers in Pennsylvania to assist in executing the Order. (Hr'g Tr. 23:7-14.) This unit specializes in serving "warrants for people wanted for crimes of violence." (Hr'g Tr. 22:23-24.)

There is nothing in the record to show that any Pennsylvania police officer actually read the Emergent Order or its supporting Affidavit. Philadelphia Police Detective Dennis Watson and Sergeant Thomas Rehiel—both of whom were assigned to the Task Force—met with Detective Lick on June 22, 2011. Detective Watson testified that he did not review the Order. (Hr'g Tr. 25:19-21.) Although Sergeant Rehiel "looked the document over," it appears that he did little more than note that the Order had the "signature and the seal" of Judge Dempsey,

before whom Sergeant Rehiel had previously testified. (Hr'g Tr. 37:24-38:10.) Rehiel thus satisfied himself the that Order was "valid." (Hr'g Tr. 37:3-5.)

Police planned a ruse to locate and detain Defendant. Two unidentified members of the Gloucester County Prosecutor's Office posed as investors interested in purchasing Defendant's Philadelphia property at 817 East Russell Street, and asked him to meet them there. (Hr'g Tr. 23:17-22.) When Defendant arrived, Detective Watson stopped him, identified himself, and patted Defendant down. (Hr'g Tr. 23:22-24:4.) He found an unlicensed, fully loaded Glock .40 caliber semi-automatic pistol in Defendant's waistband. (Id.) The officers immediately arrested Defendant. (Hr'g Tr. 24:21-25.)

As soon as Defendant was handcuffed, he asked Sergeant Rehiel to secure his unlocked car, parked across the street with the keys on the passenger seat. (Hr'g Tr. 35:4-11.) Sergeant Rehiel opened the door of Defendant's car, and saw a loaded semiautomatic magazine on the floor. (Hr'g Tr. 35:10-17.) The magazine was identical to the magazine in the gun found on Defendant. (Id.)

Detective Lick was waiting a short distance away. (Hr'g Tr. 9:20-10:19.) Once Defendant was taken into custody, Detective Lick arrived on the scene, informed Defendant of the Emergent Order, and used a buccal swab to collect his DNA, which did not link him to the Cuevas murder. (Id.) Defendant is no longer a suspect in that investigation. (Hr'g Tr. 14:16-19.)

## CONCLUSIONS OF LAW

The Parties correctly agree that federal law governs the admissibility of evidence in this case. United States v. Stiver, 9 F.3d 298, 300 (3d Cir. 1993) ("[E]vidence obtained in

accordance with federal law is admissible in federal court—even though it was obtained by state officers in violation of state law." (quoting United States v. Rickus, 737 F.2d 360, 363-64 (3d Cir. 1984))); United States v. Clyburn, 24 F.3d 613, 616 (4th Cir. 1994) (federal, not state, law controls the admissibility of evidence in federal court); United States v. Pforzheimer, 826 F.2d 200, 204 (2d Cir. 1987) ("[E]vidence admissible under federal law cannot be excluded because it would be inadmissible under state law." (internal citations omitted)).  "[T]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended."  United States v. Green, 178 F.3d 1099, 1105 (10th Cir. 1999).

### A. *Collection of DNA*

Taking a DNA sample is a search under the Fourth Amendment.  Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 618 (1989) (blood, urine, and breath samples are searches for Fourth Amendment purposes); United States v. Sczubelek, 402 F.3d 175, 182 (3d Cir. 2005) (taking of blood sample and DNA analysis of that sample are Fourth Amendment searches); United States v. Mitchell, 652 F.3d 387, 406 (3d Cir. 2011) ("[T]he collection of a DNA sample constitutes an invasion of privacy that is subject to the strictures of the Fourth Amendment." (emphasis omitted)), cert. denied, 132 S. Ct. 1741 (2012).

Earlier this year, the Supreme Court confirmed that for Fourth Amendment purposes, "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."  Maryland v. King, 133 S. Ct. 1958, 1968-69 (2013).  The Government acknowledges that its burden at suppression was unaltered by King:

> [T]he circumstances of the seizure of DNA from the defendant here required probable cause.  The defendant was not a prisoner, was not already under arrest for another crime, nor was he subject to any of the

other special circumstances that courts have relied upon when finding the reduced standard for seizing DNA. The government previously agreed that there was no basis for a <u>Terry</u> stop. The Supreme Court's opinion in <u>King</u> has not altered this standard.

(Gov't Supplemental Briefing, at 4, *ECF No. 60*.)

      B.     <u>*Warrant Requirement*</u>

"The fundamental task of any Fourth Amendment analysis is assessing the reasonableness of the government search." <u>Sczubelek</u>, 402 F.3d at 182 (citing <u>United States v. Knights</u>, 534 U.S. 112, 118 (2001)). Accordingly, absent some exceptions, the Fourth Amendment requires police to conduct a search pursuant to a warrant based "upon probable cause, supported by oath or affirmation" to be reasonable. <u>Clyburn</u>, 24 F.3d at 617 (quoting U.S. Const. amend IV.). The warrant requirement applies equally to the taking of DNA samples. <u>Schmerber v. California</u>, 384 U.S. 757, 770 (1966) ("Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned."); <u>United States v. Allen</u>, 337 F. Supp. 1041, 1043 (E.D. Pa. 1972) ("[B]lood, hair, and other bodily components are objects to be seized only through the warrant process or one of the recognized exceptions thereto." (citing <u>Schmerber</u>, 384 U.S. at 767-70)); <u>see also</u> <u>Simmons v. Poe</u>, 47 F.3d 1370, 1375 (4th Cir. 1995) (upholding warrant to obtain defendant's DNA where supporting affidavit made out probable cause); <u>United States v. Bonds</u>, 12 F.3d 540, 570 (6th Cir. 1993) (motion to suppress properly denied where magistrate correctly found probable cause supported warrant to take defendant's DNA).

Before approving a search warrant, the magistrate must "determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>United States v. Conley</u>, 4 F.3d 1200, 1205 (3d Cir. 1993) (internal citations omitted). Accordingly,

when police seek a DNA sample, they must have probable cause that the suspect's "genetic material would be linked to evidence from the crime." United States v. Solomon, Cr. No. 05-385, 2007 WL 927960, at *4 (W.D. Pa. Mar. 26, 2007); see United States v. Flanders, Cr. No. 10-29, 2010 WL 3702512, at *3 (D.V.I. Sep. 15, 2010) ("[T]he issuance of a search warrant for DNA is only proper where the affidavit supporting the application provides a basis for believing that the individual's DNA can link the individual to a criminal act.").

C.    *Review of Magistrate's Findings*

Review of a magistrate's probable cause determination is necessarily deferential. Illinois v. Gates, 462 U.S. 213, 236 (1983); United States v. Stearn, 597 F.3d 540, 554 (3d. Cir 2010). The court must "uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found." Conley, 4 F.3d at 1205. Such deference is not, however, a "rubber stamp." United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (quoting United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993) (internal citations omitted)).

"Probable cause is a 'fluid concept that 'turn[s] on the assessment of probabilities in particular factual contexts.'" Stearn, 597 F.3d at 554 (quoting Gates, 462 U.S. at 232). In deciding whether probable cause exists, the court must weigh "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id. (quoting Gates, 462 U.S. at 231). "Statements in an affidavit may not be read in isolation—the affidavit must be read as a whole." Whitner, 219 F.3d at 296 (quoting Conley, 4 F.3d at 1208).

D.    *The Emergent Order Was Not Supported by Probable Cause*

The Government concedes that the "Emergent Order for Investigative Detention" is not a search warrant, but argues this formal distinction is immaterial because the Order was supported

by probable cause. (Gov't Proposed Facts and Conclusions at 9.) I am certainly prepared to evaluate the Order as a warrant, regardless of how it is titled. Regrettably, the Government ignores not only that Judge Dempsey issued the "warrant" on less than probable cause, but that the document explicitly provides that a positive DNA test of the buccal swab police sought was necessary to obtain probable cause:

> There is a ***reasonable and well-grounded basis*** from which to believe that Edgardo Martinez may have committed the [Cuevas homicide]; and

> The results of the physical characteristics obtained during the investigative detention will significantly advance this investigation and determine whether or not Edgardo Martinez ***probably*** committed the crime.

(Emergent Order ¶¶ 2-3 (emphasis added).) Remarkably, the Government asks me to ignore the absence of a probable cause finding from Judge Dempsey and look instead to the body of the Affidavit:

> Although the order signed by the issuing authority expressly states that he has found a 'reasonable and well-grounded basis from which to believe that Edgardo Martinez may have committed the crime,' the affidavit in support of the order submitted that the affiant had 'probable cause to believe' that there was evidence supporting the application to obtain a sample of Martinez's DNA.

(Gov't Proposed Facts and Conclusions, at 9.)

Detective Lick's belief that she had made out probable cause (which she contradicts later in the Affidavit) is not probative. I well understand that in evaluating whether probable cause existed, I must review Detective Lick's supporting Affidavit. See United States v. Leon, 468 U.S. 897, 914 (1984) (magistrate determines whether ***affidavit*** establishes probable cause). I am obligated, however, to disregard Detective Lick's legal conclusions (especially those I have discredited) and decide whether the facts set out in the warrant make out probable cause. See

United States v. Helton, 314 F.3d 812 (6th Cir. 2003) (disregarding FBI agent's conclusion that his affidavit made out probable cause and making an independent finding that the affidavit failed to do so). Plainly, they do not.

As I have described, a substantial portion of the Affidavit is irrelevant, as the Government concedes. I will not consider this information in my probable cause analysis. See United States v. Calisto, 838 F.2d 711, 715-16 (3d Cir. 1988) (search warrant must be upheld if, ignoring any misleading information, it was based on probable cause); see also United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) (evaluating affidavit *de novo* after removing inaccurate information).

The Affidavit also includes information from a "confidential informant," who told the FBI that Defendant had killed Cuevas. (Aff. ¶ 10.) As I have described, however, Detective Lick acknowledged that she did nothing to confirm the anonymous informant's reliability. (Hr'g Tr. 21:13-18.) Tips from confidential informants can give rise to probable cause if the "veracity" of the tip or the "reliability" of the informant is corroborated "through investigation and surveillance." Stearn, 597 F.3d at 546, 555. "[C]orroboration through other sources of information reduce[s] the chances of a reckless or prevaricating tale, thus providing a substantial basis for crediting" hearsay. Gates, 462 U.S. at 244-45 (internal citations omitted). Detective Lick sought the Emergent Order five years after the Cuevas killing, but admitted that she had done nothing to corroborate anything the informant said. Accordingly, I will discredit the tip he or she provided.

Finally, the Affidavit includes information provided by Omar Maldonado to Cuevas's wife, who provided it to Cuevas's sister, who provided it to Detective Lick, as well as information Maldonado provided directly to the Detective in 2010 (Aff. ¶¶ 11-12.) As I have

described, Maldonado said that: 1) he and Defendant had served as Cuevas's drug couriers; and 2) Benny Rosario had told Maldonado that on the night of Cuevas's death, he and Defendant had been in Atlantic City. Maldonado thus believed that Defendant "may have been involved in the [Cuevas] murder." (Aff. ¶ 12.) Four years earlier, in 2006 (three years before Detective Lick averred that she was assigned to the Cuevas investigation), she learned from the DEA that Rosario was a drug dealer who owed Cuevas money. (Aff. ¶ 13.) Parroting the Lick Affidavit, the Government argues that '[a]lthough [the Rosario] information does not deal specifically with the defendant, it tends to prove that Maldonado's information was reliable." (Gov't Proposed Facts and Conclusions at 12.) I do not agree.

The corroboration of a single fact—that Rosario (**not** Defendant) was a drug dealer—does little to confirm the veracity of Maldonado's statements about Defendant. Even assuming *arguendo* that Maldonado was "reliable," I have found that Maldonado told Detective Lick (however belatedly or indirectly) only that he had "suspicions that [Defendant] may have been involved in the [Cuevas] murder" because Defendant ran drugs for Cuevas and was some 53 miles from Sewell on the night Cuevas was killed. (Aff. ¶ 12.) Plainly, Maldonado provided very little information even suggesting that Defendant killed Cuevas.

Once again, pared down to its credible, relevant, corroborated facts, the Lick Affidavit provides only that: Cuevas was murdered in Sewell; Defendant, a Philadelphia resident, may have been one of Cuevas's drug couriers; Defendant has a serious criminal record that does not include drug dealing; and Defendant may have been over 50 miles away from Sewell on the night Cuevas was murdered. This does not make out probable cause that Defendant participated in the Cuevas homicide. See United States v. Colon, No. 12-2009, __ F. App'x __, 2013 WL 3814938, at *2 (3d Cir. July 24, 2013) (upholding a probable cause finding where the supporting

affidavit included corroborated informant tips about the defendant's possession of firearms and drug dealing and police observation of the defendant receiving cash from known drug dealers and using a key to enter the property to be searched).

The Government's arguments to the contrary are confusing, to put it kindly. In its initial response to Defendant's motion, the Government argues:

> [Detective Lick] had probable cause to search for DNA and everyone—the detective, Assistant District Attorney, and Judge—recognized the legitimacy of the probable cause to search and approved the request.

(Gov't Mem. in Opp. To Def.'s Mot. To Suppress Physical Evidence, at 10, *ECF No. 37*.) The Government also argues, however, that the Affidavit "in this case, seeking a search of Defendant's person for DNA, did not contain probable cause that Defendant committed the [Cuevas] murder, . . . nor did it need to contain such evidence." (Gov't Proposed Facts and Conclusions, at 9.) Finally, in its "Additional Briefing," the Government concedes that "the circumstances of the seizures of DNA from the Defendant here required probable cause," and that "Detective Lick had probable cause to believe that the Defendant here was involved in the commission of the [Cuevas] homicide." (Gov't Supplemental Briefing, at 4-5.)

These wandering contentions strongly suggest that the Government itself doubts that the Affidavit makes out probable cause. Rather, it appears that the Government argues primarily that I should uphold Defendant's search under the good faith exception to the exclusionary rule. (<u>See</u> Gov't Proposed Facts and Conclusions, at 12-17.) Again, I do not agree.

### E.      *Good Faith Exception Does Not Apply*

"The Fourth Amendment requires that a search warrant be supported by probable cause" and requires the suppression of evidence seized illegally. <u>United States v. Rivera</u>, No. 11-4195, 2013 WL 1785389, at *2 (3d Cir. Apr. 26, 2013) (quoting <u>United States v. Vosburgh</u>, 602 F.3d

512, 515 (3d Cir. 2010)).  The exclusionary rule is intended to deter unlawful police conduct. "By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused."  Leon, 468 U.S. at 919 (quoting United States v. Peltier, 422 U.S. 531, 539 (1975)).

The Supreme Court has cautioned that "[w]here the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."  Id.  "[T]he exclusionary rule should only be applied when 'police conduct is sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'"  United States v. Tracey, 597 F.3d 140, 151 (3d Cir. 2010) (quoting Herring v. United States, 555 U.S. 135, 144 (2009)).  "Accordingly, we apply the rule when police conduct is 'deliberate, reckless, or grossly negligent,' or when it will deter 'recurring or systemic negligence.'"  Id.

The good faith exception does not apply to every search warrant that is determined at suppression to be defective.  Rather, the Third Circuit has held that once a magistrate concludes—however erroneously—that a search warrant is supported by probable cause, the exception will, in most instances, preclude suppression:

> The affidavit in this case presented a number of specific facts tending to show the presence of illegal activity . . . and these facts presented the magistrate with the judgmental task of evaluating their cumulative significance and testing it against the legal standard of probable cause. When judgment calls of this kind are required, we believe Leon teaches that officers are entitled to rely on the magistrate's finding of probable cause.

United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993).

As I have discussed, the "magistrate" in this case—Judge Dempsey—never found that Detective Lick's affidavit made out probable cause. On the contrary, he found that the results of the DNA test Detective Lick anticipated would "determine whether or not Edgardo Martinez probably committed the [Cuevas homicide]." (Order ¶ 3.) There was, thus, no judicial finding of probable cause upon which "the officers [were] entitled to rely." Williams, 3 F.3d at 74. In the absence of such a finding, the good faith exception to the exclusionary rule simply does not apply. United States v. Zimmerman, 277 F.3d 426, 437 (3d Cir. 2002) ("When a police officer has not presented a colorable showing [of probable cause], and the warrant and affidavit on their face preclude reasonable reliance, the reasoning of Leon does not apply." (internal citation omitted)).

The Government nonetheless argues the exception's applicability:

> [E]ven if the Order and Affidavit were not supported by sufficient probable cause, law enforcement officers had a good faith belief that the Order was valid, and the exclusionary rule should not apply.

(Gov't Proposed Facts and Conclusions, at 12.) In the Government's view, the "officers" believed that "the Order was valid" because of Detective Lick's averment of probable cause. (Gov't Proposed Law and Facts, at 12.)

> Detective [] Lick swore in the affidavit that she had probable cause to believe that the DNA of the defendant would provide evidence of the [Cuevas] homicide.

(Gov't Proposed Law and Facts, at 13.) I have already discredited this statement which cannot, in the absence of Judge Dempsey's finding of probable cause, itself make out probable cause, and so cannot trigger the good faith exception. On the contrary, "the [Emergent Order] was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Williams, 3 F.3d at 74 (internal citations omitted). It is thus

apparent that Detective Lick was, at a minimum, grossly negligent in preparing the Affidavit and Order. Further, as I have found, no Pennsylvania officer reviewed the "warrant" that purported to authorize the use of force to secure Defendant's extended detention even though the warrant was explicitly based on less than probable cause. Execution of the "warrant" in these circumstances was also grossly negligent.

Finally, Judge Dempsey and Ms. O'Brien approved the Emergent Order without suggesting substantive changes even though the Order is a nullity under Pennsylvania law. Although I may not invalidate the Order on this ground, it suggests very strongly that neither the Judge nor Ms. O'Brien reviewed Detective Lick's documents with any care. That Judge Dempsey then approved on less than probable cause a "warrant" that authorized police to use force to detain and search Defendant for "not more than five (5) hours," confirms that the Judge "abandoned his judicial role and failed to perform his neutral and detached function." (Order, at 2); Williams, 3 F.3d at 74 n.4.

In these circumstances the good faith exception plainly is inapplicable.

F.      *Defendant's Gun and Magazine Must Be Suppressed*

"[E]vidence derived from constitutional violations may not be used at trial because illegally derived evidence is considered 'fruit of the poisonous tree.'" United States v. Pelullo, 173 F.3d 131, 136 (3d Cir. 1999) (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)). Such a "taint" analysis requires me to determine more than whether the challenged evidence "would not have come to light but for the illegal actions of the police." Brown v. Illinois, 422 U.S. 590, 599 (1975) (internal citation omitted). The scope of exclusion is determined by a two-part inquiry: (a) the "proximity" of the illegal seizure to the evidence; and (b) whether circumstances subsequent to that seizure "provide a cause so unrelated to that initial

illegality that the acquired evidence may not reasonably be said to have been" tainted by that illegal arrest. <u>United States v. Burton</u>, 288 F.3d 91, 99 (3d Cir. 2002) (quoting <u>Pennsylvania ex rel. Craig v. Maroney</u>, 348 F.2d 22, 29 (3d Cir. 1965)). "The first inquiry assesses the measure of attenuation between illegal police conduct and the evidence allegedly exploited from it"; the "second inquiry concerns whether an independent source exists for that evidence." <u>Id.</u> at 100.

In executing an illegal Order, police illegally stopped and frisked Defendant, thus discovering his gun. No intervening event purged the taint of that illegal detention. <u>See</u> <u>Burton</u>, 288 F.3d at 99; <u>cf.</u> <u>United States v. Herrold</u>, 962 F.2d 1131, 1140 (3d Cir. 1992) (evidence "discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible"). Having illegally seized Defendant's weapon and arrested and handcuffed him, the police immediately secured Defendant's car, discovering the ammunition magazine. Once again, there was no attenuating or intervening event to purge the taint of the illegal stop. No source "independent" of the illegal detention would have led police to the magazine. <u>See, e.g.</u>, <u>United States v. Mosley</u>, 454 F.3d 249, 267-69 (3d Cir. 2006) (guns police discovered in a car after illegally seizing its passengers must be suppressed as the fruits of the illegality).

I am thus compelled to suppress the weapon found on Defendant and the magazine found in his car.

<u>**CONCLUSION**</u>

Because reasonableness is the touchstone of the Fourth Amendment, the seizure of Defendant's gun and ammunition cannot pass constitutional muster. Almost everyone involved in the seizure acted unreasonably or worse. Detective Lick sought an "Emergent Order" even though she had no credible reason to believe five years after the Cuevas killing that emergent circumstances existed. When her supervisor, Mr. Colangelo, provided the Detective with no guidance, she drafted a contradictory, incredible, misleading Affidavit that she averred made out

probable cause. Yet, she drafted the Emergent Order to operate on less than probable cause. Judge Dempsey and Ms. O'Brien did not question the obviously defective Affidavit and approved the Order, even though it had no basis in Pennsylvania law and purported to authorize Defendant's search and extended detention on less than probable cause. Police failed even to read this plainly defective Order before executing it.

I might view this parade of errors as a comedy were its context and consequences not so serious.

Defendant's Motion to Suppress is granted.

An appropriate Order follows.

*/s/ Paul S. Diamond*

October 7, 2013                                         _____

                                                                    Paul S. Diamond, J.